GARBARINI FITZGERALD P.C.
125 Park Ave., 25th Fl.
New York, NY 10177
Phone: (212) 300-5358
Fax: (888) 265-7054

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SIMON J. BURCHETT PHOTOGRAPHY, INC.,     Case No.: 19-cv-1576

                  Plaintiff,         **ECF CASE**

         v.               **COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT**

A.P. MOLLER MAERSK A/S,

                  Defendant.

---------------------------------------------------------------x

Plaintiff SIMON J. BURCHETT PHOTOGRAPHY, INC., by and through the undersigned counsel, brings this Complaint and Jury Demand against defendants A.P. MOLLER MAERSK A/S ("MAERSK") for: (i) damages based on copyright infringement against the defendant pursuant to the united States Copyright Act,17 U.S.C. §§ 101, et seq. (the "Copyright Act" or "Act"), and (ii) violations of the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201-03 (the "DMCA").  Plaintiff alleges below, upon personal knowledge as to itself, and upon information and belief as to other matters so indicated.

## NATURE OF THE ACTION

1.     This matter, at its core, involves defendant's infringement of plaintiff's exclusive rights, as set forth in 17 U.S.C. §106, to copy, distribute, and make his very valuable image publicly available.  Defendant also: (i) removed the copyright management information ("CMI") which plaintiff erroneously thought it had permanently embedded in the image, and (ii) falsified

CMI data in order to falsely show defendant was the author and copyright owner of plaintiff's image, in violation of the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201-03.

2.      It is highly likely there will be as many as ten additional U.S. Copyright Registrations of plaintiff which defendant has infringed by copying, distributing, and archiving images which the plaintiff sent to defendant for review.  Plaintiff will seek the disclosure of defendant's image archive as soon as possible.

3.      In November 2006, plaintiff gave defendant the image at issue here for review purposes only.  Defendant elected not to license the image.

4.      Defendant did not license the image because it wanted to conceal the fact that it planned to re-brand plaintiff's image as a MAERSK image and then disseminate it as broadly as possible.  Defendant also wanted to conceal the fact that it intended to make plaintiff's image the face of its re-branding campaign.

5.      In order to re-brand plaintiff's image, defendant used professional image editing software.  That made it possible to remove the copyright management information ("CMI") which plaintiff incorrectly thought it had permanently embedded in the image.

6.      Defendant removed from the image: (i) plaintiff's name as author of the image, (ii) plaintiff's website information, (iii) the title of the image, and (iv) the identity of the copyright owner.  Defendant then falsified new CMI data which made it appear as if defendant was the author, and owner of the copyright of the image.  Defendant changed the name of the image to include defendant's name.  Defendant's acts were intentional and diabolical.

7.      Defendant then uploaded plaintiff's unlicensed image to defendant's Flickr.com page under an "Attribution Only Creative Commons" license.  This means anyone in the world could download plaintiff's highly valuable image and use it for any commercial purpose --

royalty free.  The only prerequisite for a perpetual, royalty free license was to include an attribution – which, in light of defendant's removal, and falsification if the CMI, meant an attribution stating the defendant was the author and copyright owner.

8.     Defendant also copied and uploaded plaintiff's unlicensed image to defendant's numerous social media pages, and various blogs; allowing greater access to plaintiff's image by other businesses.

9.     Defendant even copied and posted plaintiff's image to defendant's own website and directed all users to download plaintiff's image and use it for any commercial or con-commercial purpose.

10.     In August 2016, when plaintiff discovered defendant's infringement, plaintiff sent a cease and desist to defendant, as well as a score of additional cease and desist notices after that. Plaintiff's image, however, is still active on defendant's website, and defendant continues to direct users to disseminate plaintiff's image – royalty free.

11.     Defendant has destroyed all value in not only the image at issue here, but the entire series of images plaintiff took of the Estelle Maersk.  Why would any potential licensee pay plaintiff to license one of his images, when it can get a similar image from either the defendant, or one of the 1,006 other websites where plaintiff's image is available royalty free.

12.     Defendant's actions were intentional, and malicious, and defendant clearly has no intention to comply with the its legal obligations; unless it is made to do so by this Court.

13.     Plaintiff seeks defendant's profits including ancillary profit, plaintiff's substantial loses, an award of $25,000 for each instance of defendant's violation of the DMCA, the attorneys' fees incurred here, and pre and post judgement interest.

## JURISDICTION

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1338(a) (jurisdiction over copyright actions).

15.     The image at issue was registered for copyright protection with the U.S. Copyright Office on January 17, 2019.  All rights, past and present, were assigned to plaintiff by the author, and that assignment was registered with the United States Copyright Office.

16.     This Court has *in personam* jurisdiction over the defendant because the defendant has established contacts within this Judicial District sufficient to permit the exercise of personal jurisdiction.  Defendant published plaintiff's image on the Internet, so it could be used or viewed within this Judicial District in the ordinary course of trade, and the defendant has additionally conducted business targeted at New York in the ordinary course of trade.

17.     CPLR § 302 (a)(3) authorizes this Court to exercise jurisdiction over nondomiciliaries who commit a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if it: (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii)  expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

18.     Defendant reproduced, and distributed plaintiff's image through websites like Facebook, Instagram, Twitter, Google+, blog posts, and through its own website.  This is an intentional tort (copyright infringement) committed without the state.

19.     The copyright owner resides in New York, NY, and the injury was felt in this Judicial District.

20.     Defendant is a shipping company that regularly conduct or solicit business, or engage in other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered, in this State.  Defendant's website contains a searchable vessel tracker.  A search of the past six months shows defendant delivers a massive containership of goods to the Staten Island Port an average of 27 times a month.  This Court has jurisdiction under CPLR § 302 (a)(3).

## VENUE

21.     Venue in this district is proper under 28 U.S.C. § 1391(b) and (c) and/or 28 U.S.C. § 1400(a).

22.     Plaintiff has the right to bring the within action pursuant to 17 U.S.C. § 501(b).

## PARTIES

23.     At all times material hereto, plaintiff Simon J. Burchett Photography, Inc. ("BURCHETT") was, and is, a corporation organized under the laws of the State of New York with a principal place of business in Manhattan, New York.  BURCHETT is the sole beneficial owner to all past and present rights in to the two images at question.  BURCHETT is 100% owned by renowned photographer Simon J. Burchett.

24.     Upon information and belief, defendant A.P. Moller Maersk, A/S ("MAERSK") was, and is, a company an office located at 180 Park Ave, Florham Park, NJ 07932.

## FACTS

25.     Simon Burchett is a world-renowned photographer, who has been honored with many awards and accolades.

26.     Plaintiff's aerial image at issue here, titled _7AO984, is of the container ship the Estelle Maersk. See below.

Original Image



27.     In November 2006, Mr. Burchett was retained by engine manufacturer Wartzilla for the purpose of taking a series of aerial images of a container ship called the Estelle Maersk, while it set out on its maiden voyage from Algeciras Port in Spain.

28.     The Estelle Maersk was the largest container ship in the world at the time, and Wartzilla manufactured seven of the largest ship engines ever constructed for use in the vessel.

29.     The aerial images taken of the Estelle Maersk by plaintiff were incredibly difficult, and costly to obtain.

30.     First, plaintiff had to drive over 1,000 miles from the United Kingdom, across France, and through most of Spain to the Bay of Gibraltar.  Once there, plaintiff had to retain the services of a commercial pilot and plane for the day.  Plaintiff also had to contact defendant and request permission to fly within 500 feet of the Estelle Maersk.  (Defendant granted permission to plaintiff, which is a typical courtesy.)

31.     Plaintiff then had to craft a flight plan, and meticulously review that flight plan with the pilot. (Simon Burchett is a commercial pilot as well as a photographer.)

32.     Plaintiff's flight plan was crafted to ensure plaintiff had the best opportunity to take great images of the vessel.  Plaintiff had to calculate the angle of the sun, possible glare from the water, distance from the vessel at all times, and height above the water at all times.

33.     On November 7, 2006, when the Estelle Maersk started her maiden voyage, plaintiff spent three hours and forty-five minutes making consecutive passes around the vessel. Each pass was at a different height, angle, and distance from the vessel.

34.     Plaintiff was able to capture 45-50 images of the Estelle Maersk.

35.     Plaintiff's Estelle Maersk images were, and are, truly beautiful, capturing the majesty of the vessel.  In fact, one of the Estelle Maersk images was so good, it won the silver prize in the monthly competition for commercial photographers held before the Master Photography Association.  To put that award into perspective, over 1,000 professional photographers submit their three best images to the competition each month.  Plaintiff's image beat all but one of the best images, submitted by the best professional photographers in the United Kingdom that month.

36.     Plaintiff returned to the United Kingdom immediately after the flight, mostly because plaintiff had already incurred almost $15,000 in costs.  Plaintiff then edited the Estelle

Maersk images, and permanently embedded a significant amount of CMI into each image. (The CMI including plaintiff's predecessor in interest's name as author, the URL for plaintiff's website, the identity of the copyright owner, and the name of each image.)

37.    Plaintiff then sent approximately thirty finished images to defendant for review purposes only.

38.    Almost two months later, defendant contacted plaintiff and requested a license for only half of the images plaintiff sent.  Defendant requested a dramatic reduction in the licensee fee because it was only licensing half of the images and was requesting a restricted use license limited to INTERNAL PURPOSES ONLY.

39.    Defendant was given a dramatic reduction in the license fee, paying only $1,425 instead of the $44,875 it would have cost for a one-year commercial license for the 16 images for use on the Internet only.

40.    The license at issue her states that defendant was only allowed to "use the images listed above within the company AP Moeller Maersk only . . . [and] AP Moeller Maersk cannot sell, lend, hire or loan the images, nor use them outside AP Moller Maersk." See **Exhibit 1**.

### MAERSK STEALS PLAINTIFF'S IMAGE

41.    Prior to the execution of the license, defendant used professional image editing software to remove the CMI plaintiff thought it had permanently embedded in the image.

42.    Defendant removed: (i) plaintiff's predecessor in interest's name as author of the image, (ii) plaintiff's website information, (iii) the title of the image, and (iv) the identity of the copyright owner.  Defendant then falsified new CMI data, falsely showing defendant was the author, and owner of the copyright.  Defendant even falsified a new title for the image, one which included defendant's name.

43.     Defendant then uploaded plaintiff's unlicensed image, originally titled _LAO294, to defendant's Flickr.com account under an "Attribution Only Creative Commons" license.  This means anyone in the world could download plaintiff's highly valuable image and use it for any commercial purpose -- royalty free.  The only prerequisite for creating a new unlimited use, perpetual, royalty free license, was to include an attribution – which, in light of defendant's removal, and falsification of the CMI, meant an attribution stating defendant was the author and copyright owner.

44.     As the image below from defendant's Flick.com account demonstrates, defendant, as a matter of policy, falsified the CMI and rebranded plaintiff's images as MAERSK images.



45.     Pursuant to the Creative Commons website: "Creative Commons is a global nonprofit organization that enables sharing and reuse of creativity and knowledge through the provision of free legal tools. Our legal tools help those who want to encourage reuse of their works."

46.     Defendant not only uploaded plaintiff's image in a way that allowed as broad a path for dissemination as possible, it used a platform that provides tools which "encourage reuse".

47.     Defendant also used plaintiff's unlicensed image as the "face" of defendant to the public.  In 2014, defendant sent marketing materials to thousands of colleges around the world, advertising defendant's 2015 Graduate Program.  Almost every school that received the two-page advertisement for defendant's Graduate Program, posted it to the schools website.

48.     Plaintiff's unlicensed image takes up half of the first page, and approximately 25% of the advertisement over-all.  The advertisement was the single broadest advertising program of that year.  It was sent to up to 15,000 colleges world-wide.

49.     Nearly all the schools that received the advertisement for plaintiff's Graduate Program.  This means, for the calendar year 2015, in addition to the over 1,006 commercial uses currently visible on the Internet, there were an additional up to 20,000 commercial uses.

50.     Below is one of the few schools that still have the advertisement for the 2015 Maersk Graduate Program still active on its website.





51.     In 2011, defendant uploaded plaintiff's unlicensed image to defendant's own website (the "MEARSK WEB PAGES") (plaintiff has no way of knowing how many places on defendant's website plaintiff's image has appeared, but it highly likely it has appeared on numerous pages).

52.     Plaintiff's unlicensed image is still active and available for download on defendant's website.

53.     Below are two web-pages from defendant's website (copied on the date of this Complaint), that display plaintiff's unlicensed image.  See <www.maersksocial.maersk.com>.



54.     The MEARSK WEB PAGES show defendant posted plaintiff's unlicensed image to the MEARSK WEB PAGES on February 18, 2016.  Defendant posted plaintiff's unlicensed image to its Instagram account on that same day.

55.     Plaintiff's unlicensed image, as used by defendant on the MAERSK WEB PAGES, is devoid of all the CMI data plaintiff thought it had permanently embedded.  Again, defendant must have used professional image editing software to completely remove all the CMI.

11

56.     Directly under plaintiff's unlicensed image on the MEARSK WEB PAGES, is a directive from the defendant to "SHARE THIS" image.

57.     Defendant wanted, and still wants, businesses and individuals to copy and disseminate plaintiff's image as broadly as possible and use plaintiff's unlicensed image in any commercial or non-commercial manner – royalty free.

58.     On the MEARSK WEB PAGES are "fast link" buttons, connecting to Google+, Twitter, Facebook, and Instagram.  Fast link buttons allow any business or individual to send a copy of plaintiff's image to their social media pages in the click of a digital button.

59.     Defendant provides a URL directly under plaintiff's unlicensed image on the MEARSK WEB PAGES, which allows anyone to incorporate plaintiff's image in any web-based, commercial or non-commercial manner.

60.     Defendant's continued infringement, after over a score of cease and desist notices, is disturbing.  There is no justification for defendant's continued infringement and encouragement of further dissemination.  The wide dissemination of plaintiff's image means it is likely plaintiff will never be able to license any of the Estelle Maersk images again.  Defendant's refusal to discontinue its program of dissemination of plaintiff's image is just mean.

**MAERSK'S MASTER PLAN**

61.     It would have been easy for defendant to have uploaded plaintiff's unlicensed image to its Flickr.com account with a "no further licenses granted, for any reason" restriction.

62.     Defendant could have simply clicked a box and made sure plaintiff's unlicensed image could not be downloaded from Flickr.com for any commercial use.

63.     Defendant, however, wanted plaintiff's image on as many business' and individual's websites and social media pages as possible.  A Creative Commons license is the most effective way to do that.

64.     Defendant cannot claim it was somehow unaware of the fact that it could limit or eliminate the Creative Commons license on Flickr.com.  Defendant did go through the process, and did select a restriction, when it uploaded plaintiff's image to Flickr.com.  That limitation, of course, is the attribution requirement defendant chose.  In fact, there were images which defendant uploaded to its Flickr.com account with a "no license of any kind" restriction.

65.     The forgoing is all part of defendant's calculated plan to conceal its infringement. This is further evidenced by the fact that defendant did not include the image titled _7AO984 in the 15 images it selected to license.

66.     While the "FOR INTERNAL PURPOSES ONLY" license would not have covered any of defendant's infringing uses, the omission of an image it had already been exploiting from license can only be explained by a desire to conceal from the plaintiff all facts regarding defendant's intent to re-brand and disseminate plaintiff's image as broadly as possible – royalty free.

## MAERSK'S SOCIAL MEDIA PLAN

67.     In 2011, defendant instituted an aggressive, and illegal, social media campaign, designed to increase awareness in its brand and create new customers.  Defendant hired Jonathan Wichmann as the Head of Social Media and Wichmann was put in charge of the illegal social media campaign.

68.     In his first week at defendant, Wichmann started to tap into defendant's secret database of more than 14,000 images, a significant number of which, were partially licensed, or unlicensed.

69.     Wichmann admitted: "I wasn't sure exactly how we'd be able to engage with people when I started, but in my first week I found our digital archive, which no one was using. It had 14,000 photos on file—mainly ships, seascapes, ports, et cetera. I knew I could share them and add stories to them." https://www.mckinsey.com/business-functions/marketing-and-sales/our-insights/being-b2b-social-a-conversation-with-maersk-lines-head-of-social-media.

70.     Wichmann not only admitted that defendant maintained a database of 14,000 images, but he intended to use the images from that database as the core of defendant's illegal social media campaign.

71.     Wichmann must have been aware of the fact that defendant did not have all the rights to most of the images, because he made a bizarre request to defendant's legal department. Wichmann requested, and received permission from defendant's legal department to act unfettered by legal issues. to allow him to relax all legal constraint so he could operate with impunity. https://www.mckinsey.com/business-functions/marketing-and-sales/our-insights/being-b2b-social-a-conversation-with-maersk-lines-head-of-social-media.

72.     "MAERSK's strategy was to create business to business awareness, brand awareness, and insight into the marketplace." See https://www.business2community.com/b2b-marketing/b2b-case-study-maersk-gets-social-media-right-0442328.  "Maersk believe[d] that their customers, like consumers, are people who would also like to interact with them. Based on the tremendous response to their social media activity, it looks like they're right.  Since

integrating social media into the corporate content ecosystem. See

http://blog.sterlingklor.com/b2b-content-marketing-3-steps-to-acontent-centric-organization/.

73.   Wichmann stated:

> "Maersk embraces social media as a way to connect with its business communities by telling engaging stories and sharing useful content – **content that not only provides knowledge and support, but, more importantly, sparks dialogue and gets shared**."

See http://strategydesign.co/b2b-case-study-maersk-gets-social-media-right/.

74.   The "content", however, which Mr. Wichmann refers to did not belong to defendant.  It belonged to plaintiff, and other photographers like plaintiff.

75.   Wichmann stated defendant's goal was to get the "content" shared.  Wichmann omitted the facts that that defendant stole content and deleted and falsified CMI in order to conceal its acts.

76.   Defendant started its illegal social media campaign with plaintiff's unlicensed image and went on to make plaintiff's unlicensed image the cornerstone of defendant's illegal campaign. See https://jonathanwichmann.com/tag/maersk-line/ Plaintiff's image is still active and available on the blog post made in 2013.

77.   To conceal its infringements, defendant changed the CMI on plaintiff's unlicensed image, as well as the unlicensed images of other photographers it kept in its database.

78.   After the images, kike plaintiff's) was cleansed of identifying information, defendant included them in its aggressive, and illegal, program.  Defendant started by posting plaintiff's image (and others as well) to a group of fifty-six websites.

79.   The more websites plaintiff image was posted to, the higher the probability companies or individuals would come across the image and potentially further disseminate it.

80.     With each new repost, or copy and paste of a URL or image, the pool of websites displaying infringing images grew.  This further increased the probability of more companies and individuals would meet plaintiff's image, and potentially disseminate it further.

81.      Once other Creative Commons websites like Wikimedia picked up plaintiff's image, the dissemination exponentially increased.  The vast majority of the 1,006 commercial websites that currently illegally display plaintiff's unlicensed image, indicate plaintiff's image was uploaded plaintiff's in the past three years.

82.     Defendant made a fortune from its disregard for the Copyright Act and wide-scale infringing activity.

83.     Defendant's illegal, and morally bankrupt, campaign resulted in a windfall for the defendant.  Defendant stated, "[a]t first, we didn't expect to sell shipping containers through social, though we're learning now that in fact we can." See https://www.mckinsey.com/business-functions/marketing-and-sales/our-insights/being-b2b-social-a-conversation-with-maersk-lines-head-of-social-media.

84.     Defendant admitted:

> "The company's social media program has changed the face of Maersk Line." https://www.coursehero.com/file/p16jkm1/2-Evaluate-how-Maersk-Line-executed-on-its-social-media-plan-and-platforms/.  "Maersk has completely transformed the way they interact with customers, vendors, partners, and employees. In global engagement scoring, they are 2nd only to fellow Danish B2C brand, Lego." http://strategydesign.co/b2b-case-study-maersk-gets-social-media-right/.

85.     Defendant's intentional and malicious acts not only constitute an infringement of plaintiff's rights as set forth in Section 106 of the Act, they violate the DMCA, and have destroyed all value in all of plaintiff's images of the Estelle Maersk.  Defendant has admitted to the fact that it has profited greatly from its illegal acts, and plaintiff demands all profits,

including a valuation of defendant's increase in brand recognition, as well as all losses suffered by plaintiff due to defendant's infringement.

## WIKIMEDIA COMMONS

86.     Wikipedia, the collaborative on-line encyclopedia, and Wikimedia Commons, Wikimedia Commons is an online repository of free-use images, sounds, and other media files. It is a project of the Wikimedia Foundation. a non-profit, was instrumental in the proliferation of Creative Commons licenses.  Every image on Wikipedia Commons must be uploaded under a Creative Commons license.

87.     Since 2008, when Wikipedia and its branches like Wikimedia Commons switched to exclusive use of Creative Commons license, it quickly became the cornerstone of the free information philosophy of the free cooperative encyclopedia.

88.     Once an image is uploaded to Wikipedia or Wikimedia, as a matter of policy, it cannot be removed for any reason.  Creative Commons licenses are permanent, and unrevokable.

89.     Wikipedia is notorious for defending the Creative Commons license system.  Its refusal to ever remove images uploaded to the site is necessary in order to protect the continuity of the site.

90.     Wikimedia scrapes other Creative Commons sites, like Flickr.com for additional content, and employs bots to confirm the targeted image was uploaded under a creative commons license, and, if so, copy the image and uploads it to Wikimedia, retaining the integrity of any restriction the uploader at the site placed o0n the Creative Commons license.

91.     Plaintiff's attribution only, royalty free, Creative Commons upload was downloaded and uploaded to Wikimedia Commons.

92.     Plaintiff was forced to hire an attorney and incurred just under $8,000 in attorneys' fees due to a contracted dispute with Wikimedia to remove plaintiff's image from the website.

93.     Due to defendant's affirmative acts of concealment of its infringement, plaintiff is entitled to all lost revenue due to defendant's infringement, and malicious dissemination of plaintiff's work.

94.     In light of defendant's acts and omissions here, and in consideration of the ease of transnational internet transmissions, plaintiff must be protected from the very overseas damages engendered by the defendant's actions that were directly related to defendant's malicious acts, plaintiff is entitled to all extra-territorial damages including all lost licensing and royalty fee.

95.     Plaintiff lost millions of dollars in lost licensing and royalty fees alone to date, and will lose millions in lost licensing and royalty fees going forward.

96.     Plaintiff has only been able to license one Estelle Maersk image one time.  The image of plaintiff that was uploaded to Flickr.com under a creative Commons license by defendant, has now been downloaded and used on 1,006 websites to date.  Plaintiff has lost a significant amount in lost licensee fees, as well as the devaluation of the property.  (This is a very accurate number of lost license pursuant to a reverse image look-up conducted in www.images.google.com.

97.     It shocks the conscience to witness the proliferation of plaintiff's image to very corner of the Globe.  The predatory nature of defendant's acts must be addressed.

98.    Plaintiff's image, titled _O7A254, has appeared on the cover of major book – royalty free.



99.    Plaintiff's image has appeared as an illustration in another book. See e.g.

*Development of Containerization: Success Through vision, Drive and Technology*



100.    The list of commercial uses of plaintiff's image is staggering.  Plaintiff's image has been used royalty free for commercial uses in over eighty countries.  Sadly, all of those uses state defendant is the author and content holder.  Plaintiff's image is now universally recognized

defendant's image. See images below.

.



*n sistership de l'Emma Maersk (© MAERSK LINE)*



101.     In fact, all of plaintiff's images of the Estelle Maersk are now branded MAERSK images.

**DMCA Violation**

102.    Defendant knowingly and with the intent to induce, enable, facilitate, or conceal infringement provide copyright management information that is false.  One need only look at the images on page 8 of this Complaint to see the evidence of defendant's falsifications.  Defendant (i) left the image at issue here off the restricted FOR INTERNAL USE only license, (ii) wiped any record or reference of plaintiff out of the CMI, (iii) defendant then falsified the CMI to show it was the author and content owner.  Defendant's intent to conceal its infringement is patently obvious.

103.    Defendant can't even dispute that it has changed the CMI to eliminate any record of plaintiff being the author or owner of the image and replaced it with its own name.  One need only loo

104.    Defendant has violated 17 U.S.C. § 1202(a).

105.    As stated at length in the preceding statements, during editing, plaintiff permanently embedded CMI in every image.  The CMI permanently embedded by plaintiff in the image included: (1) the author's name, (2) the name of the author's website, (3) the date and time of data registration, (4) the image title, and (5) the copyright holder.

106.    Every time one of plaintiff's image is copied, the above-information must be included.

107.    The prior license executed by defendant and plaintiff regarding images not at issue here, is informative as to the importance of CMI to plaintiff.  Even though plaintiff's images were only allowed to be used within defendant, plaintiff still required the CMI containing plaintiff's name and the URL for his website, must never be deleted, or altered.  See **Exhibit 1**.

108.    Only with a program like Adobe Photoshop for Professionals, could defendant have altered the CMI embedded in the image.  But that is exactly what defendant did, and defendant did it before the license with plaintiff was executed.

109.    Defendant deleted all of plaintiff's permanently embedded CMI.

110.    Defendant even changed the title of plaintiff's image from _7AO954 to Estelle Maersk A.P. Moller Maersk.

111.    Defendant changed the copyright holder CMI from Simon Burchett to A.P. Moller Maersk and eliminated the CMI containing plaintiff's website URL.

112.    Below is the metadata for plaintiff's image at issue here, taken from the Wikimedia Commons image copied from the MAERSK Flickr page:

**Metadata**

This file contains additional information such as Exif metadata which may have been added by the digital camera, scanner, or software program used to create or digitize it. If the file has been modified from its original state, some details such as the timestamp may not fully reflect those of the original file. The timestamp is only as accurate as the clock in the camera, and it may be completely wrong.

| | |
|---|---|
| Exposure time | 1/640 sec (0.0015625) |
| F-number | f/10 |

| | |
|---|---|
| Date and time of data generation | 14:23, 27 November 2006 |
| Lens focal length | 52 mm |
| ISO speed rating | 400 |
| Camera manufacturer | Canon |
| Camera model | Canon EOS-1D Mark II |
| Image title | ESTELLE MAERSK - A.P Møller - Maersk A/S |
| Copyright holder | A P Moller-Maersk A/S |

113.    Defendant's removal and alteration of the CMI was clearly intentional.

114.    Moreover, the only possible reason for defendant's deletion and intentional falsification of the embedded CMI was for the purpose of concealing its infringement.

115.    Plaintiff has shown (1) the existence of CMI on the [work at issue]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally.

116.    Defendant allowed anyone to copy the image and use it for any purpose, without restriction.  This can be done simply by cutting and pasting. http://maersksocial.maersk.com/post/139540676303/back-to-those-lovely-vessels-this-time-estelle.

117.    Defendant's infringement, and the steps it to conceal that infringement, were intentional, and coldly calculated.

118.    A review of the images on defendant's website and social media pages from February 2017 to June 2017 yielded the fact that defendant routinely infringes and changes CMI to conceal those infringements.  Defendant systematically engages in this activity pursuant to a well-established corporate policy and/or practice.

### FIRST CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT

119.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth here at length here.

120.    It cannot be disputed that the plaintiff has a valid copyright, and owns all rights to the image at issue here titled  _

121.    Defendant, without authority from plaintiff, reproduced, publicly displayed, and/or publicly distributed plaintiff's copyrighted images.

122.    Defendant has intentionally infringed plaintiff's exclusive rights set forth in Section 106 of the Act, and elsewhere.

123.    Defendant's use of plaintiff's copyrighted image was not for criticism, comment, news reporting, teaching, scholarship, or research.

124.    Defendant's use was not transformative.

125.     Defendant elected to reproduce and distribute plaintiff's copyrighted image without a license after a score of notices were served on defendant.

126.     Plaintiff spent just under $15,000 to capture the images of the Estelle Maersk, and expected those award winning images to generate at least $125,000 per year in perpetuity.  Those images have zero value now as a direct result of defendant's acts.

127.     Plaintiff incurred $8,000 in attorneys' fees remedying the damage done by defendant, namely, getting plaintiff's image removed from Wikimedia Commons.

128.     Defendant illegally co-opted the benefit, good will, and brand recognition generated from defendant's dissemination of plaintiff's image.  Plaintiff seeks a valuation of defendant's profit directly, and incidentally related to its infringement.

129.     As a direct and proximate result of defendants' infringement, plaintiff has incurred damages, and requests an award of defendants' profits, and plaintiff's losses, plus costs, interest, and attorneys' fees.

**SECOND CLAIM FOR RELIEF
VIOLATION OF DMCA**

130.     Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth at length here.

131.     Section 1202 of the DMCA provides, in part: "(a) no person shall knowingly and with the intent to induce, enable, facilitate or conceal infringement - (1) provide copyright information that is false, or (2) distribute or import for distribution copyright management information that is false. (b) No person shall, without the authority of the copyright owner or the law - (1) intentionally remove or alter any copyright management information, [or] (3) distribute . . . works [or] copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or having

reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title."  17 U.S.C. § 1202(a)-(b).

132.    Copyright management information is defined as: "(c) Definition.—As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

> (1) The title and other information identifying the work, including the information set forth on a notice of copyright.
> (2) The name of, and other identifying information about, the author of a work.
> (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright."
> 17 U.S.C. § 1202(c).

133.    As discussed throughout the Complaint, plaintiff permanently embeds CMI in every image he edits.  Plaintiff embedded CMI in the image at issue here which included, the author, website, copyright owner, date and time the data was registered, and the title of the image.

134.    Defendant, as a matter of corporate policy, used sophisticated professional image editing software, and removed the CMI embedded in the image by plaintiff.

135.    Defendant also falsified CMI, falsely claiming defendant was the author and owner of plaintiff's work.  Defendant even changed the title of the image to include defendant's name.

136.    The defendant violated the DMCA each time they wrongfully distributed the plaintiff's copyrighted image.

137.   Defendant did the forgoing with the intent to conceal the infringement.

138.   Plaintiff seeks all damages suffered by plaintiff as a result of the violation, and any profits of defendant that are attributable to the violation and are not taken into account in computing the actual damages.

139.   Alternatively, play may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500, or more than $25,000, per violation plus its reasonable costs and attorneys' fees

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendants, jointly and severably, and awarding plaintiff as follows:

1.   restitution of defendant's unlawful proceeds, both direct and incidental;

2.   compensatory damages in an amount to be ascertained at trial;

3.   reasonable attorneys' fees and costs;

4.   pre- and post-judgment interest to the extent allowable;

5.   all damages suffered by plaintiff as a result of the violation, and any profits of defendant that are attributable to the violation and are not taken into account in computing the actual damages.

6.   Alternatively, play may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500, or more than $25,000, per violation plus its reasonable costs and attorneys' fees; and,

7.   such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

27

Dated: February 20, 2019
      New York, New York

**GARBARINI FITZGERALD P.C.**

By:_____
      Richard M. Garbarini (RG 5496)